UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. NICOLAS P. KULIBABA<br><br>PLAINTIFF<br><br>v.<br><br>AGA KHAN DEVELOPMENT NETWORK<br>  P.O. Box 2049<br>  1-3 Avenue de la Paix<br>  1211 Geneva 2, Switzerland<br><br>       and<br><br>THE AGA KHAN FOUNDATION – USA<br>  Suite 903<br>  1825 K Street, N.W.<br>  Washington, D.C. 20006<br>  202-293-2537<br><br>       DEFENDANTS | CIV. ACTION NO.<br><br>_____<br><br>COMPLAINT FOR<br>VIOLATIONS OF<br>FEDERAL FALSE<br>CLAIMS ACT<br><br>(Title 31, U.S.C.<br>§§ 3729, et seq.)<br><br>FILED IN CAMERA<br>and<br><u>UNDER SEAL</u><br><br>JURY TRIAL<br><u>DEMANDED</u> |

Plaintiff Nicolas P. Kulibaba files this Complaint on behalf of the United States against DEFENDANTS AGA KHAN DEVELOPMENT NETWORK and the AGA KHAN FOUNDATION – USA and alleges as follows:

## I.    **INTRODUCTION**

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made or caused to be made by the DEFENDANTS to the United States in violation of the False Claims Act, Title 31 U.S.C. §§ 3729 *et seq.,* as amended ("FCA").

2.    The FCA was originally enacted in 1863 during the Civil War.  In 1986, finding that fraud in federal programs was pervasive and that the FCA was in need of modernization, Congress substantially revised the FCA by passing the False Claims Amendments Act.  Characterizing the FCA as a primary tool for combating government fraud, Congress used the 1986 amendments to enhance the government's ability to recover losses sustained as a result of fraud against the United States.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction.

The FCA provides that any person who knowingly submits a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the government.  The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  The Complaint must be filed under seal for 60 days (without service to the DEFENDANTS during that time to allow the government time to conduct its own investigation and to

determine whether to join the action). Pursuant to the Act, plaintiff seeks to recover damages and civil penalties arising from DEFENDANTS' false and improper administration of Federal humanitarian assistance grants.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

4.    This Court has personal jurisdiction over the DEFENDANTS pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because at least one of the DEFENDANTS can be found in, resides or transacts or has transacted business in the District of Columbia.

5.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least one DEFENDANT can be found in, resides or transacts or has transacted business in the District of Columbia.

## III.    THE PARTIES

### A.    The Relator

6.    The RELATOR, Nicolas P. Kulibaba, has spent thirty years working in the field of international economic development, implementing and managing U.S. Government-funded programs. RELATOR has direct and independent knowledge of violations of the False Claims Act contained herein and has voluntarily provided same to the Government prior to filing of this lawsuit.

3

7.      He was hired as "Manager – Programs and Grants" by IQBAL
NOOR ALI ("NOOR ALI"), Chief Executive Officer of the AGA KHAN
FOUNDATION – U.S.A. ("AKF-USA") in May 2004 to oversee a department
which administered the expenditure of $40 million in donor-funded grants in Asia
and Africa.  RELATOR's contract of employment was not renewed and he left
service at AKF-USA on January 21, 2005.

**B.      The DEFENDANTS**

**1.      The Aga Khan Development Network – Geneva**

8.      The DEFENDANT AGA KHAN DEVELOPMENT NETWORK
("AKDN") was established in 1967 as a group of non-denominational,
international development agencies that collaborate in selected countries of
South and Central Asia, Africa and the Middle East.  Formed and headquartered
in Geneva, Switzerland as a non-profit, private foundation, the DEFENDANT
AKDN has branches in ten countries in Afghanistan, Bangladesh, India, Kenya,
Kyrgyz Republic, Mozambique, Pakistan, Syria, Tanzania and Uganda.
DEFENDANT AKDN's five independent affiliates are located in Canada,
Portugal, Tajikistan, UK and the USA.

**2.      The Aga Khan**

9.      The Aga Khan, founder of the various "Aga Khan" organizations, is
identified as a direct lineal descendent of the Prophet Muhammed.  His Highness
the Aga Khan provides regular funding for administration and program initiatives,
as well as contributions to its endowment.  Other funding sources include
"returns on its  capital investments," as well as more than 60 national and

4

international development agencies and many thousands of individual and

corporate donors. In 2003, with a budget of US $134 million, it funded more than

140 projects in 16 countries.

### 3. The Aga Khan Foundation – U.S.A.

10. DEFENDANT AKF-USA is DEFENDANT AKDN's independent

affiliate in the United States. Since 1992, DEFENDANT AKF-USA has received

over $200 million in USG grants.

11. NOOR ALI has been Chief Executive Officer of DEFENDANT AKF-

USA since 1984. NOOR ALI is responsible for the overall management of

DEFENDANT AKF-USA, which includes overseeing a professional staff engaged

in managing international programs, financial operations, donor resource

development and communications. Prior to his current position at DEFENDANT

AKF-USA, NOOR ALI worked with DEFENDANT AKDN's Industrial Promotion

Services, beginning in 1979.

## IV. THE LAW

### A. The False Claims Act

12. The FCA provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; …(7) knowingly makes, uses, or causes to be used, a false

record or statement to conceal, avoid or decrease an
obligation to pay or transmit money or property to the
Government.

\* \* \*

...is liable to the United States Government ....

(b) For purposes of this section, the terms "knowing" and
"knowingly" mean that a person, with respect to information
(1) has actual knowledge of the information; (2) acts in
deliberate ignorance of the truth or falsity of the
information; or (3) acts in reckless disregard of the truth or
falsity of the information, and no proof of specific intent to
defraud is required.

31 U.S.C. § 3729(a) (1)(2)(3)(7).

## V.    SUMMARIES OF ALLEGATIONS

### A.    Submission of Claims for Fraudulently Inflated
### Labor Time; Obstruction of Federal Auditors

13.    Federal regulations require that the actual costs expended must be
the basis for claim submissions to the United States Government ("USG") by non-
profit recipients of USG grants. AKF-USA, a not-for-profit grantee, maintained no
records of the actual hours spent by its employees, or its subgrantees'
employees, on its USG grants for a period of thirteen years. AKF-USA makes
claims for reimbursement for labor time spent on grants based on a "budgetary
formula" which bears no relationship to the actual time expended or the available
staff time for project work. The staff is paid based upon an internal "formula" not
related to either time spent on the grants or the grants' budget for labor.

14.    In 2004, PriceWaterhouseCoopers LLP ("PWC"), acting as a
"Federal auditor" conducting an Office of Management and Budget ("OMB")

6

mandated Circular A-133 audit, requested Defendant AKF-USA to provide

contemporaneous labor time sheets to support draws on USG grants. Instead,

AKF-USA and AKDN-Geneva created and submitted fictitious, non-

contemporaneously prepared time sheets to deceive the PWC auditors.

**B.    Violation of the Fly America Act by AKF-USA**

15.    As a material condition of reimbursement for USG financed foreign

air travel, a USG grantee must travel on US flag carriers. The Defendant, AKF-

USA, totally disregarded the Fly America Act by purchasing foreign air travel on

non-US flag carriers and claiming reimbursement from USG grants, payments

which the USG would not have authorized if it was aware the travel was on non-

US flagged carriers.

**C.    AKF-USA Fraudulently Negotiates Its Indirect Cost Recovery
       Agreement.**

16.    AKF-USA Conceals from USDA & US AID that its Negotiated

Indirect Costs are Fully Paid by AKDN-Geneva, i.e., that it has no NICRA costs.

As a result, it is improperly allowed to recover indirect costs on Government

contracts.

**D.    Submission of False Statements to Recover Cost
       Overruns in a USDA Sponsored "Milk Powder Monetization"
       Program in Osh, Kyrgystan and Almaty, Kazakhstan**

17.    AKF-USA, through a Program Officer and its Director – Finances,

Administration, submitted false and fictitious records and claims to the United

States Department of Agriculture ("USDA") through its agency, the Foreign

Agricultural Service ("FAS") to conceal its improper prior, self-reimbursement of

approximately $330,000 in expenses from funds derived from sales of
reconstituted powdered milk in Osh, Kyrgyzstan and Almaty, Kazakhstan.


## VI.    LABOR COST FRAUD

### 1.    Regulatory Background and Proper Labor Distribution Methods (Time Sheet Records) – OMB Circular A-122

18.    Labor costs are usually the most significant costs incurred in the
performance of government contracts.  Also, labor dollars are often the single
largest element of cost in the bases used to allocate indirect costs; and incurred
labor costs form the basis for estimating labor for future contracts.  It is therefore
imperative that contractors establish and maintain a sound system of internal
control over the labor charging function.  Unlike other items of cost, labor is not
supported by external documentation or physical evidence to provide an
independent check or balance.  The key link in any sound labor time charging
system is the individual employee.

19.    Effective internal controls over labor charging meet the following
criteria:

> A.    Operating responsibility must be segregated from accountability.
>
> B.    Procedures must be evident, clear-cut, and reasonable so there is not confusion concerning the reason for controls or misunderstanding as to what is and what is not permissible.
>
> C.    Individual employees must be aware of the internal controls which deter violations, including the legal penalties for false claims under government contract.

8

D.     Maintenance and controls must be continually verified and violations must be remedied through prompt and effective action which serves as a deterrent to prospective violations.

20.     Rules for labor cost distribution to USG grants for "non-profit" organizations, such as AKF-USA, are contained in OMB Circular A-122. The Circular requires that:

Charges in awards for salaries and wages – whether treated as direct or indirect costs – will be based on documented payrolls. Personnel activity reports or a substitute system which has been approved by a cognizant agency must be observed. Personnel activity reports must contain an after-the-fact determination of the actual activity of each employee. Budget estimates do not qualify as support for charges to awards.

21.     As will be seen *infra*, AKF-USA distributed the labor costs of its employees' – and its domestic sub-grantees' employees' – through a "formula," apparently derived form budgetary estimates, <u>not</u> from the actual activity of the employees. Using its formula for labor cost distribution, AKF-USA fraudulently made claims against USG grants.

## 2.     **RELATOR's Duties at AKF-USA**

22.     During his employment at AKF-USA, RELATOR supervised a staff of five Program Officers ("PO"), all of whom administered over $40 million in grants and sub-grants from various USG departments and agencies, such as:

A.     Agency for International Development ("AID")

B.     U.S. Department of State  agencies, such as:

- (Office of Population, Refugees and Migration) ("PRM")
- (Office of International Narcotics and Law Enforcement Affairs) ("INL")

C.     U.S. Department of Agriculture ("USDA") agency:

- (Commodity Credit Corporation) ("CCC")

9

- (Foreign Agricultural Service) ("FAS")

### 3.   **RELATOR's Discovery of Time Sheet Billing Fraud**

23.   During several discussions with NOOR ALI throughout his tenure at AKF-USA (May 2004 through January 2005), RELATOR expressed the need to hire additional, as many as two, new POs, based upon budgeted labor allocations contained in USG grants awarded to AKF-USA .

24.   RELATOR advertised for "position available" for PO slots in The Washington Post and "development community" media websites, *e.g.*, "Interaction." Twelve to fifteen candidates responded and were interviewed. Thereafter, RELATOR provided hiring recommendations to NOOR ALI, who refused to either interview the candidates or hire them.

25.   NOOR ALI explained his refusal to hire the POs by advising RELATOR that "staff expense costs" for AKF-USA were reimbursed through its operating budget (defined annually by The Aga Khan) with AKDN funds sent from Geneva. NOOR ALI described AKDN's payment of the AKF-USA budget as "... His Highness' annual gift to AKF-USA ..." NOOR ALI further explained that AKF-USA's staffing needs were controlled by budgetary requests made by AKF-USA to AKDN and the AKDN's resulting financial contribution, not by funding for staff derived from grants. RELATOR understood---from NOOR ALI's comments---that any labor charges presented to USG donor/grantors were redundant because those costs were already covered by AKDN's grant to AKF-USA. It was unclear from NOOR ALI's explanation about the AKDN budget why

10

new POs could not be hired and funded by USG grants to AKF-US, as the grant applications provided.

26.     While RELATOR was responsible for creating the "budget narrative" which accompanied AKF-USA's annual budget proposal to AKDN in Geneva, RELATOR was never requested to provide budgetary input, nor was he ever allowed to see the ultimate budget awarded by AKDN, even for his own department. Further, only NOOR ALI, FREDERICK K. LULE ("LULE") the Director – Finance and Administration, and the AKF-USA Board of Directors saw the operating budget for AKF-USA.

27.     Shortly after RELATOR joined AKF-USA in May 2004, he undertook to administer the grants. He then became aware that, for several years – as long as twelve – AKF-USA had been submitting labor cost claims to USG donor agencies where the claimed cost of labor exceeded the actual costs incurred. He estimates that these false claims ranged from 35% to 170% in excess of the time which the individual employees actually worked on the grant.

28.     Initially, the false records he noted pertained to the five employees he directly supervised at AKF-USA. Later, RELATOR became aware of other inflated and unsubstantiated labor claims involving domestic employees of AKF-USA sub-grantees, such as Focus Humanitarian Assistance and the University of Central Asia. RELATOR also learned that since 1992, AKF-USA neither created nor maintained contemporaneous labor allocation records, as required by OMB Circular A-122.

### 4.     AKF-USA Domestic Sub-grantees and Non-USG Grantees

11

29.    The sub-grantees and USG source of funds are:

- Focus Humanitarian Assistance (source: PRM and USDA);

- the AKF-Afghanistan (source: CCC, AID, PRM, INL);

- AKF Health Services – Pakistan (source: AID);

- Mountain Society Development Support Program (source: AID and CCC);

- AKF-Rural Development Program – Pakistan (source: AID);

- AKF-Tajikistan (source: CCC);

- AKF Kyrgzstan (source: CCC);

- University of Central Asia (source: USDA);

- AKF-Kenya (source: AID);

- AKF – Tanzania (source: AID);

- AKF – Education Service (source: AID).

30.    In Afghanistan, for example, the sub-grantee, AKDN-Afghanistan, has over 1,000 employees who are paid through "blended grant funds", various international agencies and governments.

31.    RELATOR is aware that AKF-USA draws down USG grants to pay for the costs for labor, which costs are simultaneously billed to non-USG grants (*e.g.*, Flora Family Foundation, Hewlett Family Foundation and Rockefeller Foundation) and other USG grants from the INL/PRM and US AID.

**5.    The PriceWaterhouseCoopers OMB A-133 Audit**

32.    In 2004, PWC initiated an audit for the year ended December 31, 2003 of AKF-USA's financial position and, as required by OMB Circular No. A-

12

133, offered a Schedule of Expenditures of Federal Awards. The PWC audit and

its follow-up ran through November 2004.

33.    On April 19, 2004, PWC issued its "Report of Independent Auditors"

to the Board of Directors of AKF-USA. Included was:

> The accompanying Schedule of Expenditures of Federal Awards (the
> "Schedule") for the year ended December 31, 2003 is presented for
> purposes of additional analysis as required by U.S. Office of Management
> and Budget Circular A-133, *Audits of States, Local Governments, and
> Non-Profit Organizations,* and is not a required part of the basic financial
> statements. Such information has been subjected to the auditing
> procedures applied in the audit of the basic financial statements and, in
> our opinion, is fairly stated in all material respects, in relation to the basic
> financial statements taken as a whole.

34.    The PWC auditors performed the A-133 audit under a contract with

AKF-USA "for or on behalf of the United States." As such, they were acting as

"Federal auditors," as the term is used in Title 10, U.S.C. § 1516 ("Obstruction of

a Federal Audit").

35.    Because of its concern about lack of adequate records at AKF-USA

as part of its continuing duty under the audit, PWC requested AKF-USA officials

to provide to its auditors a "sample" of its employee and sub-grantee employee

labor cost records for a period contemporaneous with a portion of PWC's audit

period. PWC was concerned that AKF-USA's "... [l]ack of documentation could

result in noncompliance with the laws, regulations, and the provisions of

contracts or grant agreements, insufficient internal controls and monitoring of

funds administered, and questioned costs ..."

36.    Although it was part of his job, RELATOR was excluded from the

AKF-USA response to the PWC request for time sheets. Compliance was

determined to be the sole responsibility of NOOR ALI and FREDERICK K. LULE
("LULE"), the Director – Finance and Administration.

37.     Either NOOR ALI or LULE requested AKDN-Geneva, to assist
AKF-USA in obtaining the records requested by the PWC auditors.

### 6.     AKF-USA's Use of AKDN-Geneva to Obstruct the A-133 Audit

38.     In late summer or early fall of 2004, RELATOR was standing by the
telecopier machine in AKF-USA's Washington office when time sheets for five
domestic employees of the University of Central Asia ("UCA") project were
transmitted to Washington, DC by AKDN – Geneva.

39.     The UCA was established through a treaty signed in 2000 by the
Aga Kahn and the Presidents of Tajikistan, the Kyrgyz Republic and Kazakhstan.
The treaty was subsequently ratified by the respective parliaments.  An initial
endowment was established with three US $5 million gifts – one for each
University site in the three countries – from the Aga Khan.  On July 7, 2004,
ground was broken for the first campus, in Khorog, Tajikistan.

40.     Part of the funding for the UCA came from sales of dry milk
provided by a USDA's grant for education, dairy and nutrition programs ("EDNP")
in Central Asia.  While each employee's name was different, RELATOR
observed that the time sheets were typed with the same type font and seemed to
have been done in an identical manner.  Even the signatures seemed to be
written by the same hand.  AKF-USA subsequently provided these time sheets to
PWC auditors to conceal AKF-USA's lack of actual, contemporaneous records of
those employees' labor time distributions to the grant.

14

41.    Among the suspicious time sheets telecopied from Geneva was one for the Rector Pro-Tem of the UCA.

### 7.    **RELATOR's Compliance Efforts**

42.    PWC did not interview RELATOR during the course of the audit, although his staff was interviewed.  Nor was RELATOR invited to attend the meeting where PWC discussed its audit findings, even though he was responsible for compliance with regulations governing the grants administration.

43.    RELATOR's exclusion from the PWC audit process was entirely consistent with NOOR ALI's and LULE's negative reactions to his attempts to institute an AKF-USA compliance program for USG regulatory requirements.  For example, in June 2004, RELATOR insisted that his Department immediately institute a policy of maintaining daily time sheets to substantiate billing claims. However, this recommendation was quashed by NOOR ALI, who argued that it would be "contrary to our organizational culture to keep daily time sheets" and that "we have tried this before and it didn't work".  After RELATOR began to raise compliance issues in the fall of 2004, NOOR ALI put in place a "firewall" that prevented RELATOR's access to financial records and invoices for the programs that were managed by his department.  RELATOR, thereafter, only had access to financial information on an *ad hoc* basis.

44.    In December 2004, RELATOR prepared an "action plan" for a Corporate Integrity Program, which he hoped to institute at the AKF-USA However, NOOR ALI rejected the plan.

### 8.    **The Papadopoulos Time Sheets**

15

45.     In December 2004, RELATOR became further concerned about how portions of each of his five Program Officers' time was being allocated to the various grants. He was particularly concerned because, while NINA PAPADOPOULOS, a Program Officer, had been on maternity leave since October 2004, RELATOR suspected that her time had been billed to at least five different grants while on leave. RELATOR's suspicion was later confirmed.

46.     When RELATOR complained to NOOR ALI and LULE about the ongoing PAPADOPOULOS false billing, they claimed that such billing was legitimate because her maternity leave constituted a "fringe benefit" which could properly be billed to USG grants. RELATOR advised them that such billing was improper. (Fringe benefits constitute an element of NICRA, included in "overhead charges, rather that a direct labor cost. As such, they are paid through the NICRA charge.)

### 9.     The LULE "Billing Formula"

47.     On December 20, 2004, RELATOR asked his own administrative assistant, VICTORIA WAIMEY, to ask a member of LULE's financial department to provide her with the allocation of PO time billed to individual grants because several previous oral requests to LULE for this information had been rebuffed. LULE responded to WAIMEY that "I have this information, but will not disclose it."

48.     Following up on his efforts to discover the billing for his department RELATOR, sometime in November-December 2004, on a day when LULE was out of the office, RELATOR approached NAZLIN PEPERMINTWALLA, LULE's assistant, and asked her to explain to him the labor time allocation for his five

16

Program Officers vis-à-vis the grant portfolios. She replied that LULE used a

formula to allocate each employee's time to grants. She expressed reservations

about whether RELATOR should be allowed to review the formula, but did

provide him with a copy. He quickly copied it. Shortly thereafter,

PEPERMINTWALLA came to RELATOR and requested him to return the

document saying, "I'm not sure you're allowed to see this."

49.    The document RELATOR obtained is a spreadsheet of Program

Officers' monthly pay period entries for each month from January through

December 2004. It lists the grant name and percentage of the employee's time

to be allocated to the grant, even though *some pay periods were in the future.*

The allocation formula has no relationship with the actual work done, but is a

budgetary expectation.

50.    Each month shows two week pay periods ("15" and "31"), but does

not include grants on which the RELATOR supervised work carried out by his

staff during the indicated pay periods.. Below is a sample of the October and

November portion of the "formula":

|  | Terri Lukas | Nina Papadopoulos | Sarah Bouchie | Victoria Waimey | Falak Madhani |
|---|---|---|---|---|---|
| October 15 | MCNIC, (50%) CLICS, (50%) | EDNP-2 (75%) EDNP-1 (25%) | EQUIP-1 (25%) 0 EQUIP-2 (50%) RCC (25%) | EQUIP-1 (25%) | INL, 100 |
| October 30 | MCNIC, (50%) CLICS (50%) | EDNP-2 (75%) EQUIP-1 (25%) | 0 EQUIP-1, (25%) O EQUIP-2 (50%) RCC, (25%) | EQUIP-1 (25%) | INL, 100 |

17

| November 15 | MCNIC, (50%) CLICS, (50%) | EDNP-2 (75%) EQUIP-1 (25%) | 0 EQUIP-2 (50%) RCC, 25 EQUIP-1 (25%) | EQUIP-1 (25%) | INL, 100 |
| November 30 | MCNIC, (50%) CLICS, (50%) | EDNP-2 (75%) EQUIP-1 (25%) | 0EQUIP-2 (50%) RCC, (25%) | EQUIP-1 (25%) | INL 100 |

51.    LULE's "formula" shows PAPADOPOULOS working 75% of her time on the second Education, Dairy and Nutrition Program grant ("EDNP") and 25% on the EQUIP-01 grant. PAPADOPOULOS' last day was October 15, after which she left for four months of maternity leave

52.    The LULE spreadsheet is not congruent with the Program Officers' wide-ranging, multi-grant work efforts on donor grants and AKF-USA funded activities. The variance between actual labor and the "formula" labor is demonstrated when RELATOR prepared a June 2004 schedule of projected time commitments and the "formula" allocations. To create the schedule, RELATOR interviewed each staff member to determine actual time spent they spent in implementing each grant in their portfolio. Further, RELATOR calculated labor requirements for a sum total of the AKF USA grant portfolio. He determined that labor requirements far exceeded available staff to perform the work

53.    A further proof of a variance between LULE's labor attribution projections was demonstrated in a series of work projections created by the Program Officers themselves.

18

**10.   Continuing Coverup**

54.   On December 20, 2004, PEPERMINTWALLAH advised RELATOR
that she had been asked by NOOR ALI to construct time sheets for RELATOR's
staff for all of 2004 based on the billings to the USG because timesheets had not
been contemporaneously maintained by employees. Because of the holidays,
RELATOR believes that she would not have been able to created postdated time
sheets until 2005. The spurious time sheets were being created to further
deceive the USG and its auditors.

55.   In his "exit interview" with his successor, PAT SCHIED, on
December 22, 2004, RELATOR emphasized the need for AKF-USA to become
compliant with OMB-122 billing requirements. In a follow-up memo the next day,
SCHIED identified RELATOR's "Compliance Review Action Plan" as a priority
issue in 2004. In October 2005, a former secretary to NOOR ALI, advised
RELATOR that "… nothing had been done to institute a Compliance Plan…" as
of October 2005.

**B.   Violation of the "Fly America Act" (49 U.S.C. App. 1517)**

**1.   General Requirements of the Fly America Act**

56.   The Fly America Act, 49 U.S.C. App. 1517, as implemented in the
Comptroller General's guidelines, Decision B-138942, March 31, 1981, requires
Federal employees and their dependents, consultants, contractors, grantees, and
others performing United States Government financed foreign air travel to travel
by U.S. flag air carriers:

19

- Unless travel by foreign air carrier is a matter of necessity;

- When U.S. flag air carrier service is available

### 2.  Necessity for use of Foreign Air Carrier Service

57.     Use of foreign air carrier service may be deemed necessary if a

U.S. flag carrier otherwise available cannot provide the air transportation needed,

or use of U.S. flag air carrier service will not accomplish the agency's mission.

### 3.  Availability of U.S. Flag Carrier Services

58.     U.S. flag carrier service is available even though:

- Comparable or a different kind of service can be provided at less cost by a foreign air carrier;

- Foreign air carrier service is preferred by or is more convenient for the agency or traveler; or

- Service by a foreign air carrier can be paid for in excess foreign currency, unless U.S. flag air carriers decline to accept excess foreign currencies for transportation payable only out of these monies.

### 4.  AKF-USA's Violations of the "Fly America" Act

59.     RELATOR observed that AKF-USA totally disregarded the Fly

America Act when scheduling foreign flights for its own employees and sub-

grantees.  AKF-USA billed against USG grants for most of its foreign air travel.

60.     Examples of violations of the Act include:

- NOOR ALI frequently flew to Central Asia through Dubai on either Air France, Emirates Air or Saudi Air because he liked the first class and Business Class service on those airlines

- LULE emulated NOOR ALI's travel billing patterns.

61.     On several occasions, RELATOR challenged LULE about the

millions of dollars spent – over several years – in violation of the Fly America Act.

LULE replied that AKF-USA's system of "blending grants" from the USG, private foundations and its own endowment, as well as its reliance on the AKDN supplied budget payments, would make the violations "... difficult, if not impossible for us to monitor to be compliant ..." with the Act

**C.   AKF-USA DEFRAUDS USDA AND US AID WHEN IT NEGOTIATES ITS INDIRECT COSTS (NICRA) BY FAILING TO DISCLOSE THAT AKDN-GENEVA PAYS THOSE COSTS**

**1.   Negotiated Indirect Cost Recovery Agreement ("NICRA")**

62.   Indirect cost recovery ("ICR") is a mechanism that allows a Cooperating Sponsor ("CS") to recover costs associated with running an organization that cannot be directly linked and billed to a specific project. The Negotiated Indirect Cost Recovery Agreement ("NICRA") is an agreement that determines the rate and the base of application for which a CS can recover indirect costs. US AID typically takes the lead on the negotiation. USDA will accept a NICRA negotiated by US AID.

**2.   AKF-USA Failed to Reveal to USDA that AKDN-Geneva Paid Its Indirect Costs**

63.   Every two years, AKF-USA negotiated its NICRA with USDA. It concealed that its organizational costs were paid by AKDN-GENEVA, a private voluntary organization ("PVO"). Thereafter, each application of its NICRA percentage to a USG contract, grant or agreement resulted, in effect, in a double payment because there were no administrative costs because of the budget payment by AKDN-GENEVA.

3.    **AKF-USA Waives its NICRA**

64.    On most USG grants, AKF-USA applied its NICRA charge to the direct grant cost, including all US State Department and US AID awards in educational programs in East Africa.

65.    However, and particularly when serving as a sub-grantee to "for profit" corporations such as AECOM/PADCO (Afghanistan Alternative Livelihood Program) and Land o' Lakes (Afghanistan Dairy Rehabilitation Development Program), NOOR ALI would "waive or reduce" the NICRA to become more cost competitive for or at the suggestion of the prime award holder. He stated that he could do this because the costs were covered by His Highness' annual budget payment.

D.    **MILK MONETIZATION/BARTER FRAUD**

1.    **Summary of the Agreements by the Commodity Credit Corporation ("CCC") to Provide AKF-USA with 31,300 Metric Tons ("MT") of Nonfat Dry Milk ("NFDM") for Humanitarian Assistance in Central Asia**

66.    On August 12, 2002, the Foreign Agricultural Service ("FAS"), pursuant to Section 416(b) of the Agriculture Act of 1949, agreed to provide AKF-USA---as a "Cooperating Sponsor"--- with 5,000 Metric Tons ("MT") of Nonfat Dry Milk ("NFDM"), an "agricultural commodity", to be used for humanitarian assistance in Afghanistan, Kazakhstan and Tajikistan.  There were three donations of NFDM (2002, 2003, 2004) totaling 31,000 MTs, and they came to be known internally at AKF-USA as the "Educational, Dairy, Nutrition Program" ("EDNP").

22

67.   The terms of award for the three EDNP grants are identical, except for amounts and delivery dates.  Their purpose was to provide Ultra High Temperature ("UHT") reconstituted milk in antiseptic packages from excess quantities of NFDM held by FAS to children in Afghanistan, Kazakhstan and Tajikistan.

68.   As a "barter" in return for some of the NFDM, a company called Agribusiness Management Company ("AMC") would transform a portion of the NFDM into 2.1 million liters of UHT milk in sterile containers and ship it to distribution centers.  AMC would sell the remaining NFDM to obtain cash to pay for its additives, packaging, processing and freight for the UHT milk to the AKF-USA distribution center in Osh.  AKF-USA sold the remaining NFDM, i.e., "monetized it," to cover shipping costs from the US to Central Asia, administrative expenses of AKF-USA, AMC and its affiliates and to pay for three education and dairy projects of AKF-USA in Central Asia.

69.   In EDNP-2 and 3, AKF-USA changed the monetization of the initial bookkeeping structure so that all proceeds of monetization were to go to AKF-USA.  AMC then invoiced AKF-USA for its incurred costs.

70.   Under the EDNP award of NFDM, AKF-USA would "monetize" a portion of NFDM to cover shipping costs, administrative expenses of AKF-USA, AMC, and its affiliates, and to generate proceeds for AKF-USA's projects.  The money was to be used in AKF-USA's projects:

a.   Basic education in Tajikistan and Afghanistan;
b.   Vocational and higher education;
c.   Establishment of the University of Central Asia in Khoorog, Tajikistan;

23

    d.      Livestock and dairy development in Afghanistan, Kazakhstan and Tajikistan.

**2.     Budgets for Program**

71.     AKF-USA and its recipient agencies (FOCUS HUMANITARIAN and MSDSP) covered the expenses of the staffing positions shown in the "program administration" outline of the program's staffing.  AKF-USA was not to apply any indirect cost recovery in this Agreement.  All other costs not covered by resources provided by FAS were to be borne by AKF-USA.

**3.     AKF-USA's False Representations to the FAS
        Concerning Reimbursement of $330,000 Expense**

72.     In the course of executing the provisions of the second FAS grant (EDNP-2), AKF-USA incurred and paid a $330,000 expense, related to distribution of the NFDM which exceeded the allocation in its budget for that line item.  The excess cost arose from expenses incurred by MSDSP.

73.     Because AKF-USA had cash available from the already "monetized" 4,280 MT of NFDM authorized in EDNP-2 – without the prior and required FAS authorization – it went ahead and reimbursed itself the $330,000 from the proceeds of the sale of the NFDM.

74.     The FAS required "prior authorization" for a grantee to deviate from an agreed budget by a reimbursement of the magnitude of the $330,000 expense item.  AKF-USA risked FAS's denial of authorization and being forced to absorb the cost, itself.

75.     Subsequently, AKF-USA's reimbursement to itself of the $330,000, PAPADOPOULOS wrote to FAS falsely stating that the $330,000 expense was

still outstanding and unpaid, and requested FAS's authorization for reimbursement from the monetized funs held by AKF-USA. She proposed an "amendment" to the EDNP-2 grant which would authorize payment of the charge.

76.    As a result of her letter, PAPADOPOULOS and RELATOR met, in September 2004, with representatives of FAS, headed by FAS Grant Manger, DELPHINE HAMLIN, her deputy, MAYRA CALDERA and a third person. At the meeting, PAPADOPOULOS reiterated her false statement to the FAS, *i.e.*, that the $330,000 expense was outstanding, when, in fact, AKF-USA had paid itself from the sale proceeds of the 4,280 MT of NFDM. HAMLIN and the FAS colleagues were sympathetic and promised to investigate AKF-USA's request.

77.    About a month later, in November 2004, with PAPADOPOULOS now gone on maternity leave, FAS contacted RELATOR and requested AKF-USA to "clarify" what now appeared to FAS's legal staff to be "contradictory" data presented at the September meeting.

78.    RELATOR, after he consulted with NOOR ALI and LULE, at their direction, wrote to FAS advising it only that AKF-USA had "monetized" the 4,280 MT of NFDM.

79.    FAS, through HAMLIN's's assistant, CALDERA, called a third time, requesting further clarification. At this point, LULE took over negotiations. LULE provided yet another explanation for the treatment of the expense. The FAS then authorized the reimbursement, but directed that AKF-USA's cash grant to the UCA, to be funded by the monetization of the 4280 MT, be diminished by the $330,000 expense amount.

25

80.    NOOR ALI and LULE told RELATOR that diminution of the UCA grant would be a disaster for AKF-USA and requested FAS to shift the expense to the dairy project or one of the two education programs.

## COUNT ONE
## False Claims Act, 31 U.S.C. § 3729(a)(1)

### (Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)

81.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 80.

82.    DEFENDANTS knowingly presented, or cause to be presented, to officers, employees or agents of the United States Government false or fraudulent claims for payment.

83.    By virtue of the false or fraudulent claims made or caused to be made by the DEFENDANTS, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

## COUNT TWO
## False Claims Act, 31 U.S.C. § 3729(a)(2)

### (Making, Using, or Causing to be Made or Used a False Record or Statement)

84.    Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80.

85.    DEFENDANTS knowingly made, used, or cause to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

86.    By virtue of the false or fraudulent claims made or caused to be made by the DEFENDANTS, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a DEFENDANT.

## COUNT THREE
## False Claims Act, 31 U.S.C. § 3729(a)(3)

### (Conspiring to Defraud the United States Government Through False or Fraudulent Claims)

87.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 80.

88.    DEFENDANTS conspired to defraud the Government by getting false or fraudulent claims allowed or paid through the use of trickery, chicanery and deceit.

89.    By virtue of the DEFENDANTS' conspiracy to defraud the Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

27

## COUNT FOUR
## False Claims Act, 31 USC Section 3729 (a) (7)

### (False Statements to Conceal, Avoid or Decrease
### an Obligation to the United States)

90.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in pargagraphs 1 through 80.

91.    Defendants knowingly made, use or cause to be made or used, false records and statements, e.g., regarding Defendants' prior reimbursement of $330,000 in expenses in its EDNP-2 grant to conceal, avoid and decrease its obligation to pay or transmit money under the Defendants' grant from the FAS.


WHEREFORE, the Plaintiff demands and prays that judgment be entered in favor of the United States and against each Defendant as follows:

A.    On Counts One, Two and Three under the False Claims Act, as amended, for multiple of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper.

B.    That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

C.    That Plaintiff be awarded all costs of this action, including attorneys fees and costs; and

D.    That Plaintiff recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

hereby demands trial by jury.

By:
William J. Hardy
D.C. Bar No. 54452
1140 Nineteenth Street, N.W.
Suite 900
Washington, DC  20036
(202) 223-5120
ATTORNEY FOR QUI TAM PLAINTIFF
NICHOLAS P. KULIBABA